# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
March 19, 2013 Session

## RANDALL MILLS v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Marshall County**
**No. 15471    Robert G. Crigler, Judge**

---

**No. M2011-00620-CCA-R3-PC - Filed November 19, 2013**

---

The Petitioner-Appellant, Randy Mills, appeals the partial denial of his "Motion to Reopen Post[-]Conviction Petition and Other Relief." On appeal, he argues: (1) the trial court erred in denying him a new trial on all of the charges in this case for which he was convicted; (2) the general sessions counsel's and trial counsel's 2003 post-conviction testimony regarding his admission of guilt as to some of the charges is inadmissible as substantive evidence of his guilt on retrial; and (3) the trial court erred in failing to adjudicate the merits of his state and federal constitutional law claims. Although not raised by the Petitioner, the State argues that the trial court's agreed order, which was entered after the filing of the Petitioner's notice of appeal, is null and void because the court no longer had jurisdiction of the case. Upon review, we affirm the trial court's judgment granting a new trial in count 2, the conviction for rape of a child–penile penetration, in light of the newly discovered DNA evidence; however, we reverse the judgment denying a new trial on the remaining charges for which he was convicted, and we remand the case to the trial court for entry of an order also granting the Petitioner a new trial on counts 1, 4, 5, and 6.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Reversed in Part, and Remanded**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and JEFFREY S. BIVINS, JJ., joined.

Bryce Benjet (on appeal, pro hac vice), New York, New York; Hershel Koger (on appeal and at trial), Pulaski, Tennessee; Craig M. Cooley, (at trial, pro hac vice), New York, New York, for the Petitioner-Appellant, Randall Mills.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Charles F. Crawford, Jr., District Attorney General; and Weakley E. Barnard, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

**Trial and Procedural History Prior to 2010 Evidentiary Hearings.**  A Marshall
County Grand Jury charged the Petitioner with the following offenses:

count 1      rape of a child–digital penetration
count 2      rape of a child–penile penetration
count 3      aggravated sexual battery–defendant's mouth on victim's vagina
count 4      aggravated sexual battery–defendant's hand on victim's vagina
count 5      aggravated sexual battery–defendant's hand on victim's breast
count 6      casual exchange of controlled substance to a minor

State v. Randall Ray Mills, No. M2000-01065-CCA-R3-CD, 2001 WL 1246387, at *3 (Tenn.
Crim. App. Oct. 17, 2001), perm. app. denied (Tenn. Mar. 4, 2002).

Much of the pertinent evidence presented at trial was outlined in the direct appeal:

> On March 15, 1999, the victim, twelve-year-old C.M., lived in a duplex
> apartment in Lewisburg with her mother, Penny Martin, and her sister, Jennifer
> Hastings.  The victim's residence was on one side of the duplex, and the
> defendant lived with his two sons on the other side of the duplex.  On the day
> in question, Martin was visiting her father at St. Thomas Hospital in Nashville
> and had left Hastings in charge of C.M. During the afternoon, C.M. had spent
> time talking with the defendant's sons, "Little Randy" Mills and Dale Mills.
>
> At approximately 4:00 p.m., while C.M. was sitting in the yard outside
> the duplex, the forty-three-year-old defendant, "Big Randy" Mills, approached
> her.  The defendant told C.M. that "he had dope over at his house and to come
> over later."  C.M. understood that the defendant was offering to smoke
> marijuana with her. C.M. returned to her home where she listened to the radio
> and watched television with Hastings and Hastings' boyfriend, Robert Hodge.
> At approximately 8:45 p.m., Hastings told C.M. that she needed to go to bed
> in order to be rested for school the next day.  C.M. chose to sleep in the living
> room because she was afraid to sleep in her own bedroom while her mother
> was out of town.  Hastings and Hodge went to Hastings' room to listen to the
> radio.
>
> Soon thereafter, C.M. slipped out of the residence and went next door
> to the defendant's residence.  After the defendant answered her knock on the

-2-

door, C.M. followed the defendant into his living room where he was watching television and ironing clothes. Both of the defendant's sons were in their bedrooms. After approximately five minutes, the defendant told C.M. that "it was in his room," and C.M. and the defendant went into the defendant's bedroom where the defendant locked the door. C.M. noted that the room was lit by three candles, and the bedroom window was completely open.

C.M. sat on the bed with her feet touching the floor. The defendant pulled a marijuana cigarette from his shirt pocket and lit it. He "took a puff" and passed the marijuana cigarette to C.M. who also smoked it. After C.M. had taken three "puffs" from the marijuana cigarette, she did not want to smoke any more. She tossed the remainder of the marijuana cigarette out the bedroom window. The defendant then pulled a second, shorter marijuana cigarette from his shirt pocket and smoked that cigarette himself. C.M. testified that the marijuana made her feel "dizzy and light headed. I couldn't see or feel or anything."

C.M. related that, while her head was spinning from the effects of the marijuana, the defendant pushed her back onto his bed. With his hand, the defendant rubbed C.M.'s vagina through her blue jeans. The defendant then slipped a hand inside C.M.'s shirt, unclasped her bra, and fondled her bare right breast. The defendant removed his hand from her breast and, using both hands, pulled her blue jeans and her panties down to her ankles. At this point, the defendant kneeled in front of C.M., put his mouth over her vagina, and licked her. The defendant proceeded to repeatedly penetrate the victim's vagina with his finger. C.M. estimated that this action continued for approximately five minutes. C.M. knew the defendant had penetrated her with his finger "[b]ecause it hurt." The defendant then vaginally penetrated the victim with his penis. C.M. knew the defendant had penetrated her with his penis "because it hurt worse" than the digital penetration. C.M. asserted that she was "high" throughout the incident and, although she tried to tell the defendant to stop, she was unable to speak.

Hastings, who had heard C.M. leave the duplex, began to search for C.M. When she was unable to locate C.M. in the backyard, she asked Hodge to join the search. They got into Hodge's car and drove around the area for approximately five minutes, searching for C.M. When he heard Hodge's car start, the defendant stopped his actions, and C.M. immediately dressed. As C.M. left the defendant's residence, he put a twenty-dollar-bill in C.M.'s blue jeans pocket and said, "Here is $20, thanks." The defendant further told C.M.,

"If you tell anybody I am just going to deny it." C.M. estimated that the events occurred during a one-hour period of time.

C.M. left the defendant's residence and immediately returned home. C.M. said she was so "high" on her way home that, "I couldn't hardly walk and I fell when I went out of his door." C.M. had to wait on the front porch of her apartment until Hastings and Hodge returned to the residence because the front door of the duplex was locked and she did not have a key. Afraid of getting into trouble, C.M. initially told Hastings that she had been in the backyard. When Hastings revealed that she had looked for C.M. in the backyard, C.M. confessed that she had been at the defendant's home and told Hastings what had occurred. C.M. gave Hastings the twenty-dollar-bill the defendant had placed in her jeans. The trio then went to the defendant's residence, and Hastings knocked on the door, which was answered by one of the defendant's sons. Hastings entered the residence and, finding the defendant coming out of the bathroom, loudly confronted him about the incident. Hastings threw the money at the defendant, returned home, and called the police.

The police arrived and began their investigation. They were unable to locate the defendant for several days. Later that night, Hastings, Hodge, and C.M. decided to drive to Nashville to pick up Martin but, due to car trouble, had to wait for Martin's return the next morning. When Martin arrived, she took C.M. to the emergency room at the Marshall Medical Center where Dr. Phillip Roberts performed a "rape kit" on C.M., sending the rape kit and C.M.'s panties to the Tennessee Bureau of Investigation (TBI) laboratory for testing. Although no semen or sperm was found on the vaginal swabs performed on C.M., both substances were found in the crotch area and near the rear waistband of the victim's panties.

Id. at *1-2 (internal footnote omitted).

Additionally, at the Petitioner's trial, Sharon Jenkins, an expert in the fields of serology and DNA analysis, testified that when she tested the vaginal swabs taken from the victim at the hospital, she was unable to find any semen or sperm. However, she stated that the absence of semen and sperm did not mean that no penetration had occurred. Jenkins said her testing revealed that semen and sperm were present on the crotch area and the rear waistband area of the victim's underwear. She acknowledged that she had no way of knowing whether the semen and sperm was from one person or more than one person. Jenkins's testing showed that some of the DNA from the underwear came from the victim.

-4-

However, because semen and sperm were found on the underwear, she knew that at least one male's DNA would also be found on the underwear. Jenkins then summarized her findings for the court:

> Based on these results, the non-sperm fraction of the DNA profile is consistent with a mixture of genetic material. The major contributor of the profile matches Exhibit Number 90020204, the victim, [C.M.].
>
> The minor contributor of the DNA profile includes the gender marker, which indicates a male contributor. And locus 01 or TH[]01 matches Exhibit Number 90045636, Randall Mills. All other loci were inconclusive. The probability in an unrelated individual having the same DNA profile from the African/American population is approximately one in 270.
>
> The [C]aucasian population is approximately one in 290. What this simply means is that when I compared the DNA samples, I was able to find one locus–one marker of the DNA which matched the evidence material and I was also able to determine that it was a male contributor.
>
> That is what I found.

Jenkins stated that she ruled some areas inconclusive because they had some markers that were consistent with the victim and the Petitioner. She also ruled some areas inconclusive because she was unable to get complete DNA profiles. She confirmed that she was unable to exclude the Petitioner based on her DNA analysis. On cross-examination, Jenkins admitted that 12 of the 13 markers she tested were inconclusive.

Following the jury trial, the Petitioner was found not guilty in count 1 of the charge of rape of a child–digital penetration but was convicted of the lesser included offense of aggravated sexual battery–digital touching of victim's vagina. Id. at *3. He was convicted in count 2 of the charged offense of rape of a child–penile penetration. Id. He was found not guilty in count 3 of the charged offense of aggravated sexual battery–defendant's mouth on victim's vagina. Id. He was convicted in count 4 of the charged offense of aggravated sexual battery–defendant's hand on victim's vagina. Id. He was convicted in count 5 of the charged offense of aggravated sexual battery–defendant's hand on victim's breast. Id. Finally, the Petitioner was convicted in count 6 of the charged offense of casual exchange of a controlled substance to a minor. Id.

On direct appeal, this court affirmed these convictions but reversed and remanded the case for a new sentencing hearing because the convictions had been improperly merged and

-5-

because the judgment in count 1 showed that the Petitioner had been found not guilty of the charged offense but did not show that the jury had found him guilty of the lesser included offense of aggravated sexual battery–digital touching of victim's vagina. Id. at *10. In determining that the evidence was sufficient to support the convictions, this court noted that the victim's testimony "constituted the bulk of the evidence against the defendant at trial" and that DNA expert Sharon Jenkins's testimony that semen and sperm were found on the victim's underwear corroborated the victim's testimony. Id. at *4. The Tennessee Supreme Court denied the Petitioner's application for permission to appeal. Id. at *1.

Following the Tennessee Supreme Court's denial of permission to appeal, the Petitioner timely filed a petition for post-conviction relief, alleging that trial counsel was ineffective in failing to adequately investigate his case, in stipulating to the chain of custody, in failing to ask for expert assistance regarding the DNA analysis, and in failing to make a special request on a lesser included offense. Randall Mills v. State, No. M2003-01770-CCA-R3-PC, 2004 WL 1621690, at *5 (Tenn. Crim. App. July 20, 2004), perm. app. denied (Tenn. Nov. 8, 2004). On appeal, this court summarized the testimony by general sessions counsel and trial counsel at the post-conviction hearing:

> Trial counsel . . . testified that he had talked with the attorney who had represented the petitioner during the preliminary hearing stage in the general sessions court, learning that the petitioner had admitted his guilt. After trial counsel had been appointed, the petitioner again acknowledged his guilt to the charges. The petitioner admitted to his trial counsel that he had smoked marijuana with the victim, had fondled her, and had digitally penetrated her, but denied any penile penetration. He stated that it was only later, after the petitioner learned that there could be no probation in the event of a conviction, that the story changed and the petitioner alleged that it was "actually his son who had had sex with the . . . victim"; thus, it was only after learning that the charges carried between 15 and 25 years at 100% that he proclaimed his innocence. Trial counsel testified that he then questioned the son, who denied having sex with the victim, and thereafter informed the petitioner that if his son testified otherwise, he faced the possibility of a perjury charge. It was his recollection that the petitioner, after learning of the potential jeopardy of his son, informed him that he did not want either of his sons to testify at the trial . . . .
>
> The attorney who represented the petitioner until the matter was heard in the general sessions court testified that the petitioner had admitted digital penetration but denied penile penetration. He recalled having informed trial counsel of his conversation with the petitioner.

-6-

Id. at *4. On appeal, this court summarized the post-conviction court's findings of fact and conclusions of law in denying relief:

> At the conclusion of the evidentiary hearing, the trial court first accredited the testimony of . . . trial counsel, and [general sessions counsel], who represented the petitioner through the preliminary hearing, specifically determining that the petitioner had admitted digital penetration at the very least. It also accredited trial counsel's testimony that the petitioner had withdrawn his request to utilize either of his sons as witnesses. Next, the trial court specifically found that there was adequate investigation by the public defender's office and that the defense strategy was that the petitioner was not guilty and the victim was not a credible witness, having admitted smoking marijuana since she was 10 years old. The trial court also found that the testimony of young Randy Mills and his girlfriend, Jennifer Hastings, was untruthful for the most part and that neither witness was entitled to accreditation. It was the court's further finding that Randy Mills had failed to provide information that would have been helpful to trial counsel. It ruled that the petitioner had been unable to show any prejudice by virtue of trial counsel's failure to challenge the chain of custody and that there was no showing by the petitioner of any need for independent testing or expert assistance. Other than the charged crime, there was no indication that a lesser offense was appropriate from the evidence provided at trial. Specifically, the post-conviction court found that if the petitioner had pushed the victim to the bed, that offense would have been separate and distinct, and not lesser to the charged crimes.

Id. This court affirmed the denial of post-conviction relief. Id. at *7.

On November 7, 2005, the Petitioner filed a petition for writ of habeas corpus relief in United States District Court for the Middle District of Tennessee challenging his convictions in this case. In amended petitions, he alleged ineffective assistance of counsel and a Brady violation. The district court granted him discovery regarding these claims and in connection with this discovery, the Petitioner hired his own expert, Gary Harmor of the Serological Research Institute (SERI), who conducted another round of DNA testing on the incriminating evidence presented against him at trial. Harmor reported that he found DNA on the victim's underwear and that both the victim and the Petitioner were excluded as contributing this DNA. The Petitioner again amended his petition to include a claim of actual innocence based on newly discovered DNA evidence. On March 13, 2009, the State filed a "Motion to Stay Proceedings and Hold in Abeyance Pending Exhaustion of State Court Remedies." In this motion, the State acknowledged that the Petitioner's claim of

newly discovered evidence regarding the new DNA test results entitled him to error coram nobis review:

> Mills' newly added claim has not been exhausted, so this case should be held in abeyance pending state court exhaustion. Mills has not presented his claim based on new evidence to the state courts for review. He does not fit within the exceptions to the exhaustion requirement because he has available a state-court remedy in the form of a petition for error coram nobis through which he could litigate this new evidence claim. A petition for error coram nobis in state court may be the basis for relief where a defendant shows the existence of newly discovered evidence relating to matters litigated at trial if the defendant shows he was without fault in failing to present the evidence at the proper time and the trial court determines the evidence may have resulted in a different judgment had it been presented to the jury. Tenn. Code Ann. § 40-26-105; State v. Mixon, 983 S.W.2d 661, 668 (Tenn. 1999). Here, the petitioner's claim of newly discovered evidence is the precise basis for his unexhausted Claim 3. Because this evidence was not available at trial and Mills has claimed its unavailability would have resulted in a different verdict at trial, this claim meets the criteria for state error coram nobis review.

The State, citing Workman v. State, 41 S.W.3d 100, 103 (Tenn. 2001), and State v. Ratliff, 71 S.W.3d 291 (Tenn. Crim. App. 2001), asserted that the "Petitioner's claim of newly discovered evidence is sufficient to toll the applicable statute of limitations for bringing this claim in state court, so this remedy remains available."

On May 29, 2009, based on this newly discovered DNA evidence, the Petitioner filed a pro se "Motion to Reopen Post[-]Conviction Petition and Other Relief," wherein he moved to reopen his post-conviction petition and moved for a writ of error coram nobis. In the motion, he argued that SERI's new DNA evidence undermined the credibility of the victim's testimony as to all of the charges for which he was convicted, not just the rape of a child–penile penetration charge. Specifically, the Petitioner moved to reopen his post-conviction petition based on his claim that new scientific evidence in the form of new DNA evidence established his actual innocence of the charges for which he was convicted and that this claim, if true, would establish by clear and convincing evidence that he was entitled to have the convictions set aside or the sentences reduced. See T.C.A. § 40-30-117(a)(2), (4). He also asked for the court to issue a writ of error coram nobis based on the new DNA evidence because his failure to present this exculpatory evidence was no fault of his own, therefore requiring the tolling of the one-year statute of limitations. See T.C.A. § 27-7-103. In his motion, the Petitioner noted that the State, in its motion to stay the federal habeas

corpus case, "indicated that at the very least [he] is entitled in these circumstances to litigate his error coram nobis claim in the state courts."

On July 2, 2009, the trial court appointed counsel for the Petitioner and continued his "Motion to Reopen Post[-]Conviction Petition and Other Relief" to July 10, 2009, for the entry of a scheduling order. After several continuances, evidentiary hearings on the aforementioned motion were conducted on May 7, 2010, and July 9, 2010.

**May 7, 2010 Evidentiary Hearing.** At the beginning of the hearing, defense counsel reminded the court that the Petitioner's case had been remanded from federal district court to exhaust state remedies regarding the newly discovered DNA evidence. The State noted that this case was not really a "standard post[-]conviction matter" because the case had been filed as a motion to reopen the post-conviction petition. It added that the case was "just more or less a continuation of an already opened post[-]conviction [case]" and that it was opposing the reopening of the post-conviction proceeding. Petitioner's counsel asserted that the newly discovered DNA evidence allowed the Petitioner to reopen the case.

At the beginning of the hearing, the Petitioner called TBI Agent Joe Minor. Agent Minor, an expert in the field of serology and DNA analysis, testified that he was the DNA technical manager for the TBI's DNA division. He stated that as a part of his job, he was responsible for "overseeing the technical operations of the laboratories in Nashville, Memphis, and Knoxville" and was required to review "case files, technical reviews, and administrative reviews of both serology and DNA-related cases." Agent Minor stated that he was familiar with SERI, the laboratory where Gary Harmor was employed.

Agent Minor stated that he had reviewed the May 29, 2008 and September 8, 2008 reports issued by Harmor. When asked by the Petitioner's counsel if there was anything in Harmor's reports with which he disagreed, he stated:

> No. There is a reference to the vaginal swabs and Mr. Mills being excluded, but that technically–it is her DNA anyway. There wasn't any semen on there. Of course, he wouldn't be considered as an exclusion on that.
>
> But as far as the stains on the underwear, the panties, the waistband [of the panties] and everything, I did review the tables and the contents of the report. And with the stipulation that I have not reviewed any electronic data, I have not seen any electropherograms or any raw data in this, but just reviewing the report, I would not disagree with the findings, his conclusions.

-9-

When Petitioner's counsel asked if there was anything in Harmor's report or his conclusions that made him believe that Harmor's genetic markers were invalid, Agent Minor responded, "Based on the table and his presentation of the markers, the alleles that are present, his conclusions about these alleles [that they] did not come from Mr. Mills would be correct."

On cross-examination, Agent Minor acknowledged that before he would testify that Harmor's findings were accurate, he would have to review Harmor's raw data to ensure that the raw data supported Harmor's conclusions. On re-direct examination, Agent Minor stated that he did not request Harmor's raw data because he was asked by the State to simply review Harmor's report. He admitted that Harmor's raw data could have been transferred to him if he had contacted Harmor at SERI; however, he stated that the State never asked him to request this raw data. On re-cross, Agent Minor admitted that Petitioner's counsel never showed him the raw data from Harmor's report.

Gary Harmor, an expert in field of serology and DNA analysis, testified that he was the Assistant Director of the Serological Research Institute (SERI) in Richmond, California. He stated that his job responsibilities required him to supervise the laboratory. He also said he had the title of Senior Forensic Serologist, which meant that he "selectively work[ed] on cases" and did "technical reviews of cases" and was responsible for "quality control[,]" "testing the staff for proficiency tests[,]" and "testif[ying] in court." Harmor estimated that eight-five to ninety percent of SERI's casework was criminal, with sixty percent of the DNA analysis requested by the prosecution and forty percent requested by the defense. He said that although most of his DNA analysis was conducted for cases that were going to trial, as compared to post-conviction cases with older samples to test, he had previously conducted post-conviction DNA analysis for the state and the defense. Harmor said that he had been retained by the Innocence Project to work on this case and had been retained by the Innocence Project on other cases in the past.

Harmor stated that he first became involved in the Petitioner's case when the federal public defender's office in Nashville contacted him to review the evidence in this case. The assistant federal public defender asked him to "look over some data, and then decide whether or not retesting was necessary on the evidence that was collected." Harmor stated that after he concluded that a retest was necessary, an employee at the Marshall County Courthouse forwarded the evidence in this case to him on March 31, 2008. He was sent two pieces of evidence, item 1, the victim's underwear, and item 2, the sexual assault evidence collection kit from the victim and the sexual assault evidence collected from the suspect.

Harmor stated that the victim's underwear was examined visually and under an ultraviolet light to find any stains. He said the underwear was fairly heavily stained with a tan substance on the inside. He stated that the underwear had been previously sampled in

two different locations, the crotch area and the rear waistband area. He made note of those prior samples and took pictures of the areas where the samples had been taken. Then an acid phosphatase test, a presumptive test for determining whether or not a stain could be seminal fluid on the crotch and waistband of the panties, was conducted, which was negative. He stated that the fact that the acid phosphatase test was negative did not mean that there was no male DNA on the evidence. He then took samples of the crotch of the underwear in three different locations and of the waistband in one location.

Harmor stated that he used the P-30 test, which indicates whether seminal fluid is present, on the evidence. When he used the P-30 test on the waistband cutting, item 1-1, it was positive. He also stated that one of the crotch cuttings, item 1-4, was positive for P-30, but the other three crotch cuttings, items 1-2 and 1-3, were negative for P-30. He stated that the fact that 1-2 and 1-3 were negative did not mean that no male DNA was present. After receiving positive results from the P-30 test on items 1-1 and 1-4, he was able to identify sperm on items 1-1 and 1-4. He then performed a differential extraction for DNA processing, which resulted in two pots of DNA, the epithelial DNA and the sperm cell DNA or sperm fraction DNA. Once the DNA was concentrated to a drop of liquid, part of that liquid was taken and subjected to quantification. Harmor stated that when he subjected the liquid in this case to quantification, he was able to identify a sufficient amount of DNA to perform amplification and genetic marker analysis.

Harmor stated that he did the extraction, quantification, amplification for the 1-1, 1-2, 1-3, and 1-4 items. He then placed a portion of the amplified product into an instrument that separated out the pieces of copied DNA by size. Once the data was collected, "it [was] put through a program that identifies the size of the pieces that came through and what marker they belong to." He stated that the genetic marker analysis was short tandem repeat, or STR testing, which is the generally accepted method of DNA testing. He stated that the unknown samples that were tested were taken from the victim's underwear and the known samples that were tested were taken from the Petitioner and the victim.

Harmor stated that he had to request a second sample from the Petitioner because the first sample that was taken from him prior to trial "had degraded" and he was unable "to get all the markers out of it that should have been there." He stated that he obtained the second sample to confirm the fifteen markers, plus the amelogenin. Harmor stated that he went through the standard procedures for obtaining a DNA sample from a prisoner. He said that he was able to get a partial profile from the Petitioner's original sample but was able to get a full profile from the Petitioner's second sample.

Harmor stated that he identified male DNA on unit 1-1, a cutting from the underwear waistband. He then compared the genetic marker profile in unit 1-1 with the genetic marker

profile from the Petitioner and determined that he was excluded as the source of the DNA. He also identified male DNA on unit 1-2, a cutting from the crotch of the underwear. When he compared the genetic marker profile in unit 1-2 with the genetic marker profile from the Petitioner, he determined that the Petitioner was excluded as a source of this DNA as well.

Harmor stated that he reviewed Sharon Jenkins's November 2, 1999 report and her raw data but never received the electronic data from her DNA analysis. He stated that Jenkins identified a 13,14 type at the D8S1179 locus for the Petitioner's known sample. However, Harmor stated that he identified a 13, 13 type from the Petitioner's known sample at the D8S1179 locus. He stated that he believed Jenkins incorrectly reported the Petitioner as a 13, 14 based on an artifact rather than a true peak at 14 in her analysis. He also stated his belief that Jenkins "over amplified" the sample from the Petitioner, which caused the sample to have artifacts rather than true peaks at the markers. He explained that "[w]hen you over amplify a sample and add too much DNA to it, then the artifacts start to happen along the baseline" and the "software will label it as a type 14, even though it is an artifact." He said, "In [Jenkins's] results, there is an extremely high 13 peak, well off scale, and then a real minute 14 peak next to it that is amongst the jittering of the baseline." He added, "I think that it was missed as an artifact rather than a real type."

Harmor stated that Jenkins identified sperm cells on the underwear crotch and on the waistband, which was consistent with his results. He said that his sample 1-3 was adjacent to the sample that Jenkins's took from the crotch of the victim's underwear. He stated that his other two samples were in another part of the crotch area. He was unable to retest what Jenkins had tested because her cutting from the victim's underwear was gone. Harmor said that he was able to identify more genetic material than Jenkins because of his preparation of the sample. He noted that Jenkins "should have seen some kind of signal from the sperm DNA fraction, based upon the number of sperm that were there; maybe not a complete profile, but there should have been some signal of some sort from that, and they were totally negative." He also noted that Jenkins only drew "conclusions about the epithelial or non-sperm fraction of the crotch of the pair of panties and not the sperm fraction." However, he would have included the conclusions regarding the sperm fraction "to give a more complete result of the analysis[.]" He asserted that the difference in his results and Jenkins's results was not attributable to advances in technology because he had been using the same method of preparation for over twenty years.

On cross-examination, Harmor stated that he was not saying that the test where Jenkins found one marker that she said could have come from the Petitioner was wrong. He explained:

I looked at what I was provided, as far as her electropherograms, and the results are very difficult to see because the scale that it was printed at only shows the two types that she detected from is consistent with Randy Mills is very tiny on the baseline.

So I would prefer to have looked at the electronic data and then analyzed it myself, with spreading the scale out, so that I could see what the peaks themselves looked like, to make sure they weren't artifacts.

I wasn't able to do that because I was provided with no electronic data. But from what I see that was provided to me, I can't say that she doesn't have the right answer.

Harmor confirmed that SERI was accredited in the same manner as the TBI laboratories. He acknowledged that an assistant, Heather Parsons, did the examination sampling under his direction and performed the testing and that he analyzed the data. He also acknowledged that Parsons gathered the raw data, but he asserted that he reviewed the raw data. He agreed that if Parsons was inaccurate in her testing procedures, this could skew the results.

Harmor admitted that he did not contact the TBI crime laboratory to see if the liquid sample that Jenkins tested was still in existence because he did not think of doing that and assumed it was not in existence. Harmor acknowledged that his May 28, 2008 report and his September 8, 2008 report were basically the same except for the addition of the Petitioner's new known sample for the later report.

Harmor acknowledged that DNA experts, when conducting analysis, have to make a "partially subjective determination." He said, "The analysts, once they have their data run through the software programs, then look[] at the data and make[] a judgment on the data that is present, as to whether or not it is an artifact or real." He added, "Once that is determined, then they develop a profile from that evidence that is used for comparison to the known samples."

He acknowledged that he made a subjective call when he concluded that Jenkins mistakenly identified the Petitioner's known sample as a 13, 14 at the D8S1179 locus. He agreed that Jenkins machine would have printed out a graph, just as his machine did. He acknowledged that Jenkins machine probably printed out a 13, 14 even though he looked at her graph and reached a different conclusion. However, Harmor asserted that he had two other results showing that the Petitioner's known sample was a 13 rather than a 14 at that locus.

-13-

Harmor acknowledged that the newer machines and chemicals allow analysts to detect DNA at a lower level. He acknowledged that the Y STR test would target just the Y chromosome and would give more information on the sample regarding what the male donor types were. He admitted that the Y STR would give a more definitive indicator that the sample had been over amplified. He stated that he did not conduct the Y STR test, even though it was available at SERI, because he determined that he had enough information from which to draw conclusions after looking at his results from the regular STR tests, "which are more of a powerful discriminator."

**July 9, 2010 Evidentiary Hearing.** Sharon Jenkins, who was qualified as an expert in the field of serology and DNA testing, testified that she began working at the TBI in 1996 and left the TBI in 2008 to become the primary caregiver to her ill husband. Jenkins stated that she examined the underwear from the victim and the known samples from the victim and the Petitioner. She said she made three or four cuttings from the underwear for testing. Jenkins acknowledged that it was possible for evidence to become contaminated before it arrives at a lab if it is not sealed. She also stated that touching or talking over evidence could contaminate the evidence because it could deposit DNA. She acknowledged that the container holding evidence of the victim's underwear had been opened prior to her receiving it during trial. She stated that in the Petitioner's post-conviction petition, he complained that the container holding the victim's underwear had been opened prior to trial.

Jenkins stated that the victim's underwear tested positive for semen and sperm. After getting a request for DNA testing from the district attorney's office, she did cuttings from the underwear. With these cuttings, she did a differential extraction to separate the epithelial cells from the sperm cells. She then ran those samples in the instrument that was calibrated and tested. She stated that when the results came off the instrument, she looked at the results and did a comparison of the DNA profiles that were presented in the unknown sample with the DNA profiles from the victim's and the Petitioner's known samples. She stated that the instrument prints out a chart of data with specific peaks for the alleles, otherwise known as loci or markers. Jenkins stated that sometimes the instrument shows peaks that are not numbered "because it is not a true peak." She stated that some unreliable peaks are "stutter peaks," "pull-up peaks," or "general artifact[s], something that is really not a peak." She explained the meaning of an artifact or a pull up:

> [Sometimes], due to the level of the DNA in these cases, you have [an] artifact, meaning it is not a true peak, but it might be a line that shows up in a region that may be an allele. Pull up would be because the region directly above a peak is so high, it is going to cause the peak below it to become actually higher than it really is. So it is an artificial peak, for lack of a better term.

She also explained that stutter is "the appearance of a peak, or maybe a peak within four base pairs of what is a true peak[,]" which you can see on the data.

She stated that all scientists look for 13 different areas on the DNA, as well as the amelogenin marker, which determines whether the DNA is male or female. Jenkins explained that if the instrument numbered an allele as a 14, then she would compare that to her known sample to determine if the person who contributed that sample had a 14 in that area of the DNA. If so, then that allele could belong to that individual.

Jenkins stated that the TBI required her to use a baseline of 150 RFU (relative fluorescence units) for the instrument to recognize peaks because "[t]hat baseline would have been what you call the optimal or the best area to call a peak if it is a true peak or not." At the time that she did her original tests in 1999, she did not look below 150 RFU because that was against TBI's policy, which was based on the manufacture's recommended standards at that time.

Jenkins stated that of the 13 areas she was looking at in the DNA, she found one location that she used not to exclude the Petitioner. She stated that this area was TH01 and she found male and female chromosomes in that area. She acknowledged that at the Petitioner's trial, she testified that at the area of TH01, in the nonsperm fraction, she found alleles 5, 9, which were both consistent with the Petitioner at that area. She concluded at trial that an unrelated individual having the same DNA profile from the African-American population was 1 in 270 and in the Caucasian population was 1 in 290. Jenkins stated that her testimony would be the same today, that she was unable to rule the Petitioner out in the TH01 area. To explain her statement that the other loci were inconclusive, she said, "[E]ither I had markers that didn't give me any peaks, or I had markers that were in common with the victim's standard, or I had markers that could have been pull up, or they could have been stutter or just not attributable to the victim and subject markers."

Jenkins stated that everyone, except identical twins, would have different DNA. However, she acknowledged that a father and a son would have similar DNA because DNA is inherited from a person's mother and father.

Jenkins stated that a few days before testifying at the July 9, 2010 hearing, she returned to the TBI lab, with TBI's permission, to review her original data on the computer. She explained that her original data was on a compact disk, and when she placed it in the computer, it printed up "just like the day I examined it, gosh, back in 1999." She then reviewed the old data at the baseline level of 150 RFU to check all of the peaks that were called and to refresh her memory as to the peaks she did not call or that she determined to be inconclusive. She then dropped the baseline level to between 50 and 150 RFU. At that

-15-

point, she began trying to locate all of the markers that were presented on the SERI data. Jenkins stated that when she originally examined the crotch area of TH01 in 1999, she did not notice any false peaks. When she reexamined them a few days before this hearing and dropped the baseline to between 50 and 150 RFU, she did not find any other markers in that area. Jenkins stated that when she lowered the baseline, she found no sperm fraction on the crotch area and no sperm fraction on the waistband of the underwear at the locus TH01. However, she noted that SERI found in the TH01 locus an allele number 8 on the sperm fraction of the waistband in item 1-1 and on the sperm fraction of the crotch of the panties in item 1-4, but she was unable to find an 8 there. She explained that the difference could be because of the "technology, the sensitivity of their instruments" or because they may have been able to find something different because they had a different cutting or because of contamination. She said that after dropping the baseline, she still could not exclude the Petitioner on TH01.

Jenkins acknowledged that SERI found in the area D135317 alleles 12, 14 in item 1-1 that were male. She stated that SERI used these alleles to exclude the Petitioner because his known markers at that location were 8, 12. In addition, SERI found in the area D135317 a 12, 14 in the sperm fraction for item 1-2 as male, which SERI used to exclude the Petitioner because his known markers at that location are 8, 12. In area D165539, SERI found alleles 9, 11 in item 1-2, which SERI used to exclude the Petitioner because his known markers at this location were 10, 13. Jenkins said that after reviewing SERI's reports and data and after conducting additional analysis of her data, she stated that there was nothing that would change the testimony that she gave at the Petitioner's trial.

On cross-examination, Jenkins stated that she had never committed an error on any casework and had never committed an error on any of her DNA proficiency tests. She stated that she identified two alleles, a 13 and a 14 at the D8S1179 region from the Petitioner's known sample. She admitted that Harmor at SERI identified a 13, 13 at the D8S1179 region for the Petitioner's known sample and that even after SERI got a new sample from the Petitioner, SERI still got a 13, 13 at that region for him upon retest. When asked who was correct, Jenkins stated:

> I can answer that by saying there is a peak at 13 and then there is a lower peak at the 14, which is one of those peaks that may or may not be a peak. If you look at my data, which is over there now. And the instrument has indicated a peak. So we recorded it.

When asked if she mistyped that region, Jenkins said, "Again, it is not mistyped. The instrument does that. It is there. And because it was there, both I and the technical reviewer marked it, because it was there."

Jenkins admitted that there were two alleles consistent with the Petitioner at the TH01 region, which meant that 1 in 290 Caucasians could have this allele. She acknowledged that her STR testing produced very little human DNA, despite the fact that she identified semen and sperm on the underwear. She said that there was not an abundance of sperm in that area.

Looking at SERI's results, Jenkins acknowledged that in item 1-1, which was the stain on the waistband of the underwear, SERI identified 13 out of 16 alleles in the nonsperm fraction and all sixteen alleles in the sperm fraction. She also acknowledged that in item 1-4, one of the cuttings taken from the crotch of the underwear, SERI identified 14 of the 16 alleles in the nonsperm fraction and identified 15 of the 16 alleles in the sperm fraction. She acknowledged that when she examined both of these areas of the underwear, she was unable to get as much DNA.

Jenkins acknowledged that when she tested the evidence in 1999, she identified a lot of alleles that excluded the Petitioner, but she did not call them. When she conducted her new test just before this hearing, she stated that she wanted to compare SERI's results with her results to see if SERI's markers were really markers or if they were "false peaks" or "pull up, . . . stutter, [or] artifacts[,]" which are unreliable.

Jenkins stated that she did not report foreign alleles in her 1999 report because she deemed them inconclusive:

> [A]fter looking at all of the data in all of the different locations and ruling out the ones that weren't clear cut peaks that I could testify to were peaks, they were denoted as inconclusive. So the report reflects what was found on the underwear. It didn't go so far as to say the underwear crotch, the underwear waistband. That is the data itself, in my notes.

She stated that she did not call the 9, 16 at the D8S1179 locus because in 1999, they were below her calling level of 150 RFU.

Jenkins stated that she did not call the 19, a weak result at 150 RFU, at the VWA locus that excluded the Petitioner because she determined that it was a false peak even though the instrument called it. She also stated that the 19 allele that she identified at the FGA locus was not from the victim or the Petitioner; however, she said she did not call it because it was a female allele based on the height of the peak.

Jenkins stated that she had a problem with some of SERI's conclusions because Harmor "got a combination of weak mixtures, so it may or may not be there and it may or may not be male[.]" She added, "I can't tell if all of these [alleles found by SERI] are [from

a female donor or] all of these are [from a male donor] because it wasn't stated either, because some of them are similar to the victim." She stated that she was unable to review SERI's raw data, even though it had been provided, because the TBI uses a different type of platform for its testing.

Jenkins acknowledged that her testimony at this hearing was not different than her testimony at trial, where she testified that she found one allele that was consistent with the Petitioner's DNA profile at the TH01 marker, meaning that 1 in 290 Caucasians would have that allele at that location.

On re-direct examination, Jenkins stated that while Harmor had reviewed an assistant's testing, her report was based on her own testing. Jenkins stated that for item 1-1 at least half of SERI's alleles were identified at under 150 RFU. She acknowledged the possibility that contamination could affect SERI's results. She also acknowledged that two different men could have deposited two different sets of DNA to the underwear: "Remembering we did a differential extraction, where you are looking at nonsperm cells and sperm cells, and since we didn't find the sperm cells, it is more than likely that those are nonsperm cells, or skin cells, epithelial cells. And, yes, they could be deposited on the panties." In addition, she admitted that these skin cells could have been deposited on the underwear during trial if someone sneezed near them, if someone's dandruff landed on them, if someone talked over the underwear, or if someone came in contact with the underwear during the normal course of the trial. She stated that this could account for SERI having to go below 150 RFU to find the alleles.

On re-cross examination, Jenkins admitted that the underwear could have been contaminated prior to receipt by the TBI lab. She also acknowledged the possibility that some DNA was on the underwear before the assault and that it belonged to someone other than the assailant in this case.

The State recalled Agent Minor at the conclusion of this hearing. Agent Minor testified that he found it unusual that the alleles that were typed from the sperm and nonsperm fractions of SERI's 1-1 cutting from the waistband of the victim's underwear had alleles that were not attributable to either the victim or the Petitioner. He said that based on his experience, he would expect these nonsperm alleles to match the victim and the fact that they did not suggested "that there is either some type of contamination or the panties didn't belong to [the victim] or had been worn by someone else." He explained that when testing a sample, you are typing a nonsperm fraction and a sperm fraction, and the sperm fraction could contain sperm cells or nonsperm cells. He acknowledged that both the nonsperm fraction and the sperm fraction could contain skin cells if it was contaminated. Agent Minor

explained that the TBI laboratories have a policy of not reexamining evidence that has been examined by another lab because there are "no guarantees of how it has been handled."

Agent Minor stated that he had an issue with SERI's conclusion in paragraph 2 that "the genetic profile [in item 1-2 of the crotch of the underwear] is not consistent with the genetic profile obtained from Randy Mills, therefore, Randy Mills is excluded . . . as a donor to the genetic marker profile from the sperm fraction for item [1-2], major and minor donor profiles are from unknown individuals." Agent Minor stated, "I am really kind of puzzled why they would take something that is negative for sperm and divide it into sperm and nonsperm fraction, and then report in their report that he is excluded from the sperm fraction. It is a little bit misleading in that regard and not clear."

Agent Minor stated that the problem he had with SERI's conclusion in paragraph 3 that items 1-2, 1-3, and 1-4, where item 1-4 was the only one that tested positive for semen, were consistent with the victim but were not consistent with the Petitioner. He stated, "It is a little unclear . . . that we have two negative samples and a positive sample being reported as epithelial fractions and excluding Mr. Mills." He stated that he would have separated the conclusions for items 1-2, 1-3, and 1-4.

Agent Minor's problem with SERI's conclusion in paragraph 4 was similar to his issue with paragraph 3. He stated that although the Petitioner was excluded as a donor to the sperm fraction in the items of 1-2, 1-3, and 1-4, SERI implied that items 1-2 and 1-3 had a sperm fraction. He stated, "[T]o say that [the Petitioner] is excluded from a sperm fraction where there is no sperm is just a little confusing."

Agent Minor stated that the issue he had with SERI's conclusion in paragraph 6 was that SERI stated that the Petitioner was excluded even though no alleles were found on the vaginal swabs other than the victim's. He stated that SERI's conclusion was prejudicial because it implied "that there was [genetic material] there that is excluding him" even though the only genetic material belonged to the victim.

Agent Minor stated that the victim's underwear could have been contaminated at the SERI lab and that contamination could explain why SERI's findings were different from TBI's findings. He also acknowledged that sperm transfer could have occurred if the victim's sister or mother had sexual relations with an individual and their underwear got placed on top of or under the victim's underwear.

Agent Minor stated that TBI's detection threshold was set at 150 RFU because it was shown "that people [got] more callable types as a whole from that particular level." He stated that if you go too low you may get false peaks. He said that around the year 2000,

when scientists realized that you could detect and see profiles below 150 RFU, the TBI set a new policy stating "that we would drop the threshold only to benefit the defense in an effort to possibly exclude someone from alleles." However, he stated that the TBI labs "don't make calls from that, because of the accuracy of the validation levels that we have set at a particular number. Again, for us, it is 150 RFU's."

Agent Minor stated that his concern in comparing the TBI results with the SERI results was that SERI found "some alleles that weren't present in 1999[.]" He explained:

> [T]he only way that I can account for [SERI] getting additional alleles that didn't exist in 1999 is because there is potential there that those alleles came after they left TBI. Whether that was in the courtroom, as you talked about earlier, or within the laboratory itself, that did the testing. And certainly there could be some precontamination, like [Petitioner's counsel] brought up, as well."

Agent Minor stated that after reviewing Jenkins's report, he believed that the information that Jenkins testified to in court in this case was correct.

On cross-examination, Agent Minor acknowledged that because TBI now goes below 150 RFU, Jenkins's new findings would be reported by the TBI. He acknowledged that the alleles that excluded the Petitioner that were not reported by the TBI in 1999 would now be reported. Agent Minor stated that had the Petitioner's case been tried today, "you would have results that said you have mixtures, and then you would have loci that would define which ones were not consistent with Mr. Mills."

On re-direct examination, Agent Minor agreed that when Jenkins went below 150 RFU last week, she still did not find all of these alleles that SERI found. He acknowledged that Jenkins did not find anything exculpatory but stated that there were some alleles that were not consistent with the Petitioner. Agent Minor agreed that the trial court had to decide why SERI found exculpatory alleles that the TBI did not find. He also agreed that these differences could be the result of contamination. Agent Minor admitted that the 19 and 25 at the FGA locus in TBI's results, which showed that there was a male contributor in the nonsperm fraction, probably resulted from skin cells from another male.

On re-cross, Agent Minor admitted that at the D8S1179 locus for the Petitioner's known sample, Jenkins called a 13, 14, and SERI called a 13, 13. He stated that after reviewing the data, he would call it a 13, 13 at that locus just as SERI did.

-20-

**Procedural History Following Evidentiary Hearings.** On November 24, 2010, the Petitioner filed a "Post-Hearing Brief Regarding [His] Writ of Error Coram Nobis Pursuant to Tenn. Code Ann. § 40-26-105(a) and Petition to Re-Open Pursuant to Tenn. Code Ann. § 40-30-117." In this brief, the Petitioner requested that the court grant his writ of error coram nobis, vacate his conviction, and grant him a new trial "because the newly discovered DNA results may have resulted in a different judgment had they been presented to the jury."

On January 26, 2011, the post-conviction court entered a memorandum order granting a new trial on the charge of rape of a child–penile penetration but denying relief on the remaining charges in counts 1, 4, 5, and 6:

> The only DNA evidence the jury had to consider was that of Agent Jenkins. The conclusion is inescapable that had the jury had before it SERI's results to compare with the results of Agent Jenkins, their [sic] verdict might well be different as to the [rape of a child–]penile penetration charge. This is not to say that a jury's verdict would be different after hearing SERI's results only that it might be different. The DNA post-conviction court understands that to be the correct legal standard: Whether new evidence may have led to a different result. Whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceedings might have been different. House v. Bell, 547 U.S. 518 (2006); State v. Vasques, 221 S.W.3d 514 (Tenn. 2007).
>
> Accordingly, the DNA post-conviction court finds that the defendant should be granted a new trial as to the [rape of a child–]penile penetration count so that a jury can consider expert testimony from both sides. The Court, however, denies the defendant's request for a new trial regarding the other charges of which he was found guilty because the SERI results do not necessarily cast doubt upon these convictions. At the post-conviction hearing, the defendant's trial counsel . . . testified that the defendant told him that he had smoked marijuana with the victim, had fondled her, and had digitally penetrated her, but denied any penile penetration. Also, at the post-conviction hearing, the defendant's attorney in General Sessions Court . . . testified that the defendant admitted digital penetration. The post-conviction court accredited the testimony of both of these attorneys and [its] denial of post-conviction relief has been affirmed on appeal. In this court's mind the SERI DNA results do not undermine confidence in the outcome of those convictions in light of this testimony. Sedley Alley [v]. State, No. W2006-01179-CCA-R3-PD, 2006 WL 1703820, at [*]9 (Tenn. Crim. App., at Jackson, June 22, 2006), perm. to appeal denied, (Tenn. June 27, 2006); Sedley Alley [v]. State,

No. W2004-01204-CCA-R3-PD, 2004 WL 1196095, at [*]9; see, e.g., State v. Workman, 111 S.W.3d 10, 18 (Tenn. Crim. App. 2002).

On February 23, 2011, the Petitioner filed a notice of appeal. On April 20, 2011, the post-conviction court entered an "Agreed Order," which incorrectly claimed that the Petitioner had been convicted of the following counts: count 2, rape of a child–penile penetration, for which the Petitioner received a twenty-year sentence; counts 3, 4, and 5, aggravated sexual battery, which were merged and for which the Petitioner received a sentence of nine years and six months each; and count 6, casual exchange of a controlled substance to a minor, for which the Petitioner received a two-year sentence. The order noted that the trial court ordered each of these sentences be served concurrently. In the agreed order, the State agreed to do the following:

a.    The State shall nolle Count Two (Rape of a Child - Penile Penetration).

b.    Counts Three, Four, and Five (aggravated sexual battery charges) shall be merged.

    i.    The sentence for Counts Three, Four, and Five shall be amended from 9 years 6 months to 12 years at 100%.

c.    The sentence for Count Six (Casual Exchange) shall remain at 2 years.

d.    The 12 year sentence for Counts Three, Four, and Five shall run concurrently with the 2 year sentence for Count Six.

e.    Petitioner shall receive full credit for the 11 years 3 months he has already served in the Tennessee Department of Correction[].

Also on April 20, 2011, amended judgments were filed reflecting the dismissal of count 2, rape of a child–penile penetration, and guilty jury verdicts in counts 3, 4, and 5, aggravated sexual battery, with concurrent sentences of twelve years, and count 6, casual exchange of a controlled substance to a minor, with a concurrent sentence of two years.

**ANALYSIS**

**I. Whether the Petitioner is Entitled to Relief if the Motion is Construed as a Motion to Reopen the Post-Conviction Petition or as a Petition for Writ of Error Coram Nobis.** On appeal, the Petitioner apparently concedes that he is not entitled to relief if his motion is construed as a motion to reopen the post-conviction petition. However, he argues that if his motion is construed as a petition for writ of error coram nobis, then the trial court erred in refusing to grant a new trial on all of the charges for which he was convicted because the new DNA evidence undermined the victim's testimony as to all of these counts, not just the count of rape of a child–penile penetration. In response, the State contends that if the Petitioner's motion is construed as a petition for post-conviction relief, the court erred by

-22-

reopening the petition and granting partial relief in the form of a new trial on the child rape–penile penetration charge because the newly discovered evidence does not satisfy the requirement that the Petitioner is actually innocent of the charges of which he was convicted. However, the State concedes that if the motion is treated as a petition for writ of error coram nobis, then the trial court properly granted relief on the child rape–penile penetration charge and properly denied relief on the other charges. We conclude that the trial court properly construed the motion as a petition for writ of error coram nobis, thereby entitling the Petitioner to relief.

In order to reopen a petition for post-conviction relief, the appellant must make a claim falling within the three narrow exceptions outlined in Tennessee Code Annotated section 40-30-117(a):

A petitioner may file a motion in the trial court to reopen the first post-conviction petition only if the following applies:

(1) The claim in the motion is based upon a final ruling of an appellate court establishing a constitutional right that was not recognized as existing at the time of trial, if retrospective application of that right is required. The motion must be filed within one (1) year of the ruling of the highest state appellate court or the United States supreme court establishing a constitutional right that was not recognized as existing at the time of trial; or

(2) The claim in the motion is based upon new scientific evidence establishing that the petitioner is actually innocent of the offense or offenses for which the petitioner was convicted; or

(3) The claim asserted in the motion seeks relief from a sentence that was enhanced because of a previous conviction and the conviction in the case in which the claim is asserted was not a guilty plea with an agreed sentence, and the previous conviction has subsequently been held to be invalid, in which case the motion must be filed within one (1) year of the finality of the ruling holding the previous conviction to be invalid; and

(4) It appears that the facts underlying the claim, if true, would establish by clear and convincing evidence that the petitioner is entitled to have the conviction set aside or the sentence reduced.

T.C.A. § 40-30-117(a) (Supp. 2009) (emphases added). The Tennessee Supreme Court has interpreted the "actually innocent" language in subsection (2) to mean that "the person did not commit the crime." Keen v. State, 398 S.W.3d 594, 612 (Tenn. 2012).

Here, in support for his motion to reopen the post-conviction petition, the Petitioner claimed he had new scientific evidence establishing that he was actually innocent of the offenses for which he was convicted. The State argues in its brief that the Petitioner is not entitled to relief on his motion to reopen the post-conviction petition because the newly discovered evidence did not establish that he was actually innocent of these offenses. We agree. In Howell v. State, the Tennessee Supreme Court discussed the higher showing that a defendant must make in filing a motion to reopen a post-conviction proceeding:

> [D]efendants petitioning for post-conviction relief are held to more stringent standards as they proceed further along in this process. They must present only a "colorable claim" to relief in an original petition, but in a motion to reopen a post-conviction proceeding they must present facts which "would establish by clear and convincing evidence" that they are entitled to relief. These progressively higher standards attempt to balance the State's interest in maintaining the finality of judgments with a petitioner's interest in attacking a possibly unconstitutional conviction or sentence.

151 S.W.3d 450, 460 (Tenn. 2004) (internal citation omitted).

We conclude that the Petitioner's claim of new scientific evidence in the form of new DNA evidence fails to present a claim under which a motion to reopen a post-conviction proceeding may be granted. While SERI was able to exclude the Petitioner as the contributor of the DNA in two places based on its testing, Jenkins was unable to exclude the Petitioner at the TH01 locus and concluded that the probability in an unrelated individual having the same DNA from the African/American population was approximately 1 in 270 and the probability in an unrelated individual having the same DNA from the Caucasian population was 1 in 290. At best, SERI's results merely call into question whether the Petitioner committed the offenses in this case but fall short of establishing by that the Petitioner was actually innocent of these charges. Accordingly, the Petitioner has not presented scientific evidence establishing his actual innocence and has not alleged any of the other statutory reasons for reopening a post-conviction proceeding.

Moreover, even if the Petitioner had established that he was actually innocent of the offenses for which the petitioner was convicted, his appeal of the denial of his relief as to the other charges was untimely. At the time that the post-conviction court denied his motion to reopen, the Petitioner had only ten days to file an application for permission to appeal in the

Court of Criminal Appeals, and the State had only ten days to respond. T.C.A. § 40-30-117(c) (Supp. 2009). In this case, the trial court filed its memorandum order on January 26, 2011, and the Petitioner did not file his notice of appeal until February 23, 2011, well over the ten-day time limit for filing an appeal to this court.

On the other hand, we conclude that the trial court properly construed the Petitioner's motion as a writ of error coram nobis. A writ of error coram nobis is available to convicted defendants. Id. § 40-26-105(a) (Supp. 2009). However, a writ of error coram nobis is an "extraordinary procedural remedy" that "fills only a slight gap into which few cases fall." State v. Mixon, 983 S.W.2d 661, 672 (Tenn. 1999) (citing Penn v. State, 670 S.W.2d 426, 428 (Ark. 1984)); State v. Workman, 111 S.W.3d 10, 18 (Tenn. Crim. App. 2002).

The Tennessee Supreme Court has distinguished a motion to reopen a post-conviction petition from a petition for writ of error coram nobis:

> The grounds for seeking a petition for writ of error coram nobis are not limited to specific categories, as are the grounds for reopening a post-conviction petition. Coram nobis claims may be based upon any "newly discovered evidence relating to matters litigated at the trial" so long as the petitioner also establishes that the petitioner was "without fault" in failing to present the evidence at the proper time. Coram nobis claims therefore are singularly fact-intensive. Unlike motions to reopen, coram nobis claims are not easily resolved on the face of the petition and often require a hearing.

Harris v. State, 102 S.W.3d 587, 592-93 (Tenn. 2003).

Tennessee Code Annotated section 40-26-105 explains the relief available through a petition for writ of error coram nobis. The statute provides, in pertinent part:

> The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

The issue shall be tried by the court without the intervention of a jury, and if the decision be in favor of the petitioner, the judgment complained of shall be set aside and the defendant shall be granted a new trial in that cause. In the event a new trial is granted, the court may, in its discretion, admit the petitioner to bail; provided, that the offense is bailable. If not admitted to bail, the petitioner shall be confined in the county jail to await trial.

T.C.A. § 40-26-105 (b), (c) (Supp. 2009). A petition for writ of error coram nobis must contain the following: "(1) the grounds and the nature of the newly discovered evidence; (2) why the admissibility of the newly discovered evidence may have resulted in a different judgment had the evidence been admitted at the previous trial; (3) the petitioner was without fault in failing to present the newly discovered evidence at the appropriate time; and (4) the relief sought by the petitioner." Freshwater v. State, 160 S.W.3d 548, 553 (Tenn. Crim. App. 2004) (citing State v. Hart, 911 S.W.2d 371, 374-75 (Tenn. Crim. App. 1995)). We note that "[t]he decision to grant or deny a petition for the writ of error coram nobis on the ground of subsequently or newly discovered evidence rests within the sound discretion of the trial court." Hart, 911 S.W.2d at 375 (citations omitted).

In State v. Vasques, 221 S.W.3d 514, 527-28 (Tenn. 2007) (emphasis added), the Tennessee Supreme Court reiterated the standard for coram nobis relief:

In an effort to amplify the standard established in Mixon and confirmed by our own decision in Workman, we hold that in a coram nobis proceeding, the trial judge must first consider the newly discovered evidence and be "reasonably well satisfied" with its veracity. If the defendant is "without fault" in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence may have led to a different result. In the Court of Criminal Appeals opinion in this case, Judge Joseph M. Tipton described the analysis as follows: "whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceedings might have been different." Although imprecise, our standard, which requires determination of both the relevance and the credibility of the discovered information, offers a balance between the position of the State and that of the defense. In our view, this interpretation upholds the traditional, discretionary authority of our trial judges to consider the new evidence in the context of the trial, to assess its veracity and its impact upon the testimony of the other witnesses, and to determine the potential effect, if any, on the outcome.

The statute of limitations for a petition for writ of error coram nobis is one year from the date the judgment becomes final in the trial court. T.C.A. § 27-7-103 (Supp. 2009); Mixon, 983 S.W.2d at 671. For the purposes of a petition for writ of error coram nobis, a judgment becomes final thirty days after the entry of the trial court's judgment if no post-trial motions are filed or upon entry of an order disposing of a timely post-trial motion. Mixon, 983 S.W.2d at 670 (citing Tenn. R. App. P. 4(c); State v. Pendergrass, 937 S.W.2d 834, 837 (Tenn. 1996)). Due process considerations may toll the one-year statute of limitations when a petitioner seeks a writ of error coram nobis. Harris v. State, 301 S.W.3d 141, 145 (Tenn. 2010). "[B]efore a state may terminate a claim for failure to comply with procedural requirements such as statutes of limitations, due process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner." Burford v. State, 845 S.W.2d 204, 208 (Tenn. 1992).

The State has the burden of raising the statute of limitations bar as an affirmative defense in a coram nobis proceeding. Harris, 301 S.W.3d at 144 (citing Harris, 102 S.W.3d at 593). Whether a claim is barred by the statute of limitations is a question of law, which this court reviews de novo. Id. (citing Brown v. Erachem Comilog, Inc., 231 S.W.3d 918, 921 (Tenn. 2007)). Significantly, the State did not raise the bar of the statute of limitations as an affirmative defense in this case; therefore, we will proceed as if the statute of limitations does not preclude our consideration of this case.

We conclude that the trial court properly construed the Petitioner's motion as a petition for writ of error coram nobis. In reaching this conclusion, we note that the language in the Petitioner's motion shows that he actively pursued relief in the trial court through not only a motion to reopen a post-conviction petition but also a petition for writ of error coram nobis. See Harris, 102 S.W.3d at 594 n.9 (holding that a petitioner who is seeking to have the trial court consider both a motion to reopen and a petition for writ of error coram nobis as possible avenues for relief "must be required to actively pursue both in the trial court"). The court's memorandum order shows that the court was "reasonably well satisfied" with the veracity of the new DNA evidence and implicitly held that the Petitioner was without fault in failing to present the new DNA evidence at the proper time. It also held that the newly discovered evidence related to matters which were litigated at trial. Citing the standard in Vasques, 221 S.W.3d at 527, the trial court held that "had the jury had before it SERI's results to compare with the results of Agent Jenkins, their [sic] verdict might well be different . . . ." Consequently, we conclude that the trial court properly construed the motion as a petition for writ of error coram nobis, thereby entitling the Petitioner to relief.

**II.  Whether the Trial Court Erred in Failing to Grant Coram Nobis Relief on All of the Petitioner's Charges.**  The Petitioner argues that the court erred in failing to grant him coram nobis relief on all of the charged counts for which he was convicted.  The State responds that the court properly granted relief on the child rape–penile penetration conviction and properly denied relief on the other charges.  Specifically, the State contends that "[t]he presence of the DNA, even as a single locus, still corroborates the victim's account of the facts."  Although the State concedes that the trial court erred in taking into account the general sessions counsel's and trial counsel's 2003 post-conviction testimony stating that the Petitioner admitted that he smoked marijuana with the victim, fondled her, and digitally penetrated her, it argues that the court's decision to deny the writ of error coram nobis on the remaining counts was proper and should be upheld.

In his reply brief, the Petitioner argues that he is conclusively excluded by the DNA on the victim's underwear and asserts that the trial court implicitly rejected "any speculative theory that the underwear was contaminated or that there is an existing dispute as to the DNA results."  He also argues that, given the State's concession that the trial court erred in considering prior counsel's 2003 post-conviction testimony, this court should grant him a new trial on the remaining charges.  We conclude that the trial court erred in denying the Petitioner a new trial on all of the charges for which he was convicted.

Initially, we note that the Petitioner failed to include the entire trial transcript in the record on appeal.  The transcripts from the evidentiary hearings show that the State made the trial transcript an exhibit, and it appears that the trial court considered the trial record when it granted coram nobis relief in the form of a new trial on count 2.  Because the trial court considered this information and because we must consider it to evaluate the Petitioner's claim, we have taken judicial notice of the entire record from the Petitioner's direct appeal.  State v. Lawson, 291 S.W.3d 864, 869-70 (Tenn. 2009).

During the evidentiary hearings, the trial court evaluated the veracity of SERI's new DNA results and compared them with Jenkins's DNA results from the Petitioner's trial.  The court also heard testimony from Agent Minor, the technical manager for the TBI's DNA division.  Harmor testified that SERI's results showed that the Petitioner was excluded from the male DNA from unit 1-1, the sample from the waistband of the victim's underwear, and was excluded from the male DNA on unit 1-2, the sample from the crotch of the victim's underwear.  He noted that he was able to identify more genetic material on the underwear than Jenkins.  He also noted that Jenkins only drew "conclusions about the epithelial or non-sperm fraction of the crotch of the pair of panties and not the sperm fraction."  Harmon stated that he would have included the conclusions regarding the sperm fraction "to give a more complete result of the analysis."  Regarding the one marker that Jenkins asserted could have been contributed by the Petitioner, Harmon stated, "I would prefer to have looked at the

electronic data and then analyzed it myself, with spreading the scale out, so that I could see what the peaks themselves looked like, to make sure they weren't artifacts." Finally, he opined that Jenkins had mistakenly identified the Petitioner's known sample as a 13, 14 rather than a 13, 13 at the D8S1179 locus and asserted that he had two results showing that the Petitioner was a 13, 13 at that locus.

At the evidentiary hearing, Jenkins testified that during the Petitioner's trial she concluded that at the locus of TH01, in the non-sperm fraction, she found alleles 5, 9, which were both consistent with the Petitioner's known sample at that locus. She further concluded at trial that an unrelated individual having the same DNA profile from the African-American population was 1 in 270 and in the Caucasian population was 1 in 290. She confirmed that her current testimony was the same as at the Petitioner's trial, namely that she was unable to rule the Petitioner out at the TH01 locus. Jenkins stated that when she lowered the baseline to between 50 and 150 RFU, she found no sperm fraction on the crotch area or the waistband area of the underwear at the TH01 locus. Although she acknowledged that SERI found an allele number 8 on the sperm fraction of the waistband in item 1-1 and the sperm fraction of the crotch of the panties in item 1-4, she stated that she was unable to find an 8 there. She explained that the difference could be because of the "technology, the sensitivity of their instruments" or because they may have been able to find something different because they had a different cutting or because of contamination. She said that after dropping the baseline, she still could not exclude the Petitioner at the locus TH01. Jenkins acknowledged that SERI found in the area D135317 alleles 12, 14 in item 1-1 that were male. She stated that SERI used these alleles to exclude the Petitioner because his known markers at that location were 8, 12. In addition, she noted that SERI found a 12, 14 in the sperm fraction for item 1-2 as male, which SERI used to exclude the Petitioner because his known markers at that location are 8, 12. In area D165539, SERI found alleles 9, 11 in item 1-2, which SERI used to exclude the Petitioner because his known markers at this location were 10, 13. Jenkins denied mistyping the Petitioner as a 13, 14 at the D8S1179 locus. She acknowledged that her testing produced very little DNA despite the fact that she had identified sperm and semen on the victim's underwear and that SERI's testing produced substantially more DNA in the non-sperm and sperm fractions in units 1-1 and 1-4. She also acknowledged that when she tested the underwear in 1999, she identified a lot of alleles that excluded the Petitioner, but she did not call them because she deemed them inconclusive. Jenkins said that after reviewing SERI's reports and data and after conducting additional analysis of her data, she stated that there was nothing that would change the testimony she gave at the Petitioner's trial.

Agent Minor also testified at the evidentiary hearings. He stated that based on his review of SERI's report, there was nothing in SERI's findings with which he disagreed. However, he said that he had not reviewed SERI's raw data to ensure that it supported

SERI's conclusions. He noted that he had some problems with the wording of SERI's conclusions in its reports and that contamination of the evidence could explain why SERI's findings were different from TBI's findings. Agent Minor stated that he, like SERI, identified the Petitioner's known sample as a 13, 13 at the D8S1179 locus, even though Jenkins identified the Petitioner as a 13, 14 at that locus. After considering the evidence from the coram nobis hearing and the evidence presented at trial, the court granted the Petitioner a new trial on count 2.

First, the Petitioner argues that SERI's exculpatory DNA evidence undermines the victim's testimony as to all of the charged counts, not just the charge of rape of a child–penile penetration. He claims that this court on direct and post-conviction appeal held that Jenkins's "incriminating DNA evidence bolstered and corroborated [the victim's] entire testimony" and that "the new exculpatory DNA evidence eviscerates [the victim's] entire testimony." He asserts that "the new exculpatory DNA evidence casts substantial doubt on all of [the victim's] trial testimony–not just her penile penetration testimony" and "[h]ad the jury known of the exculpatory DNA evidence, [it] may have acquitted Mills" of the remaining counts."

We believe the new DNA evidence casts at least some doubt on the accuracy of Jenkins's results and calls into question not only whether the Petitioner committed the offense of rape of a child–penile penetration but also whether the Petitioner committed any of the charged offenses. On direct appeal, this court recognized that the victim's testimony "constituted the bulk of the evidence against the defendant at trial" and that Jenkins's testimony that semen and sperm were found on the victim's underwear corroborated the victim's testimony. Interestingly, Jenkins testimony at trial was that she found alleles 5, 9 at the locus TH01 that were consistent with the Petitioner and that the probability in an unrelated individual having the same DNA profile from the African/American population was 1 in 270 and in the Caucasian population was 1 in 290. However, the alleles that Jenkins stated were consistent with the Petitioner were found in the non-sperm fraction of the sample, rather than the sperm fraction of the sample. Moreover, Harmor stated that SERI was able to identify more genetic material on the underwear than Jenkins and that SERI's results showed that the Petitioner was excluded from the male DNA from unit 1-1, the sample from the waistband of the victim's underwear, and was excluded from the male DNA on unit 1-2, the sample from the crotch of the victim's underwear. We agree with the Petitioner that the new DNA evidence undermines the victim's credibility not just as to the child rape–penile penetration charge but also as to all the charges for which the Petitioner was convicted. Consequently, we hold that a reasonable basis exists for concluding that had the new DNA evidence been presented at trial, the result of the proceedings on all of the charges might have been different. See Vasques, 221 S.W.3d at 527.

Second, the Petitioner contends that the court erred in denying relief on his other convictions based on trial counsel's and general sessions counsel's 2003 post-conviction testimony. He argues that in determining whether the new exculpatory DNA evidence may have affected the original jury's verdict, the court was limited to considering "both the evidence at trial and that offered at the coram nobis proceeding[.]" Vasques, 221 S.W.3d at 527 (emphases added). He claims that because trial counsel's and general sessions counsel's testimony was not presented at the Petitioner's trial or the coram nobis hearing, the court was prohibited from considering this testimony when determining whether to grant coram nobis relief. We agree.

The law is clear that the coram nobis court should have considered only the evidence from the trial and the coram nobis hearing. See id. ("If the defendant is 'without fault' in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence may have led to a different result."). We recognize that the evidence the trial court was to consider in this case was complicated by the fact that the Petitioner's motion not only asked for the court to issue a writ of error coram nobis but also asked the court to reopen the post-conviction petition. However, because the new scientific evidence failed to prove that the Petitioner was actually innocent, as required in a motion to reopen the post-conviction proceedings, the trial court should have considered only the evidence presented at trial and the evidence presented at the coram nobis hearing when determining whether the Petitioner was entitled to relief.

Upon review, we conclude that the trial court erred in not granting the Petitioner a new trial on all the charges for which he was convicted. Consequently, we affirm the trial court's judgment granting a new trial on count 2, we reverse the judgment denying a new trial on counts 1, 4, 5, and 6, and we remand the case to the trial court for entry of an order also granting the Petitioner a new trial in counts 1, 4, 5, and 6.

**III. Whether Prior Counsel's 2003 Post-Conviction Testimony Regarding the Petitioner's Admissions as to Some of the Charges is Admissible as Substantive Evidence of the Petitioner's Guilt on Retrial.** The Petitioner claims that the issue of whether the State can use trial counsel's and general sessions counsel's 2003 post-conviction testimony, which focused on ineffective assistance of counsel, as substantive evidence of guilt at the defendant's retrial is an issue of first impression in Tennessee. He asserts that the implied waiver doctrine, the attorney-client privilege, and the Fifth and Sixth Amendments preclude admission of such testimony as substantive evidence of guilt on retrial. Although the State concedes that the trial court erred in considering prior counsels' 2003 post-conviction testimony, it does not address the issue of whether prior counsels' testimony is

admissible as substantive evidence of the Petitioner's guilt upon retrial. We note that the Petitioner is asking this court to decide this issue based on circumstances that have not yet occurred and may not arise in the future. See State v. Rogers, 703 S.W.2d 166, 169 (Tenn. Crim. App. 1985) ("An appellate court will not pass on lawsuits when there is no justiciable controversy presented, or render advisory opinions on questions which are premature and contingent and may never arise in the future."). It is well-established that this court cannot give advisory opinions. See State v. Rodgers, 235 S.W.3d 92, 97 (Tenn. 2007); State ex rel. Lewis v. State, 347 S.W.2d 47, 48 (Tenn. 1961). Accordingly, we decline to review this issue.

**IV. Whether the Trial Court Erred in Failing to Adjudicate the Merits of the Petitioner's State and Federal Constitutional Claims.** First, the Petitioner claims that he was denied due process because the presentation of false DNA testimony by Jenkins rendered his trial fundamentally unfair because it may have affected the jury's decision to convict him on his remaining counts. Second, he argues that Jenkins's inaccurate test of the DNA in 1999 prevented him from presenting a complete and meaningful defense because he was unable to attack Jenkins' DNA testimony and the victim's testimony. Third, he contends that he is entitled to relief because the new exculpatory DNA evidence proves that he is actually innocent of his remaining counts. See Dellinger v. State, 279 S.W.3d 282, 285 (Tenn. 2009) ("We hold that a claim of actual innocence based on new scientific evidence is cognizable in an initial petition for post-conviction relief."). Finally, he argues that "the cumulative effect of prejudice from a range of different claims . . . may collectively provide a basis for relief whether or not the effect of individual deficiencies warrants relief." The State fails to address any of these issues. We conclude that the trial court did not err in declining to address the merits of the Petitioner's state and federal constitutional claims.

We note that we have already concluded that the Petitioner was not entitled to reopen his post-conviction proceeding because the new scientific evidence did not establish that he was actually innocent of the charges in this case and because he failed to allege any of the other statutory grounds that would entitle him to reopen his post-conviction proceeding. Although we have concluded that the Petitioner was entitled to coram nobis relief, we note that state and federal constitutional claims are inappropriate in a petition for writ of error coram nobis, and the appropriate vehicle for addressing constitutional violations is in a petition for post-conviction relief. See T.C.A. § 40-30-203 ("Relief under this part shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States."). Because the Petitioner failed to allege any statutory ground for reopening his post-conviction proceeding, we conclude that the trial court did not err in declining to address the merits of his state and federal constitutional claims.

**V. <u>Whether the Agreed Order and Amended Judgments are Void.</u>** Although not raised by the Petitioner, the State argues that the trial court's April 20, 2011 agreed order, which was entered after the filing of the Petitioner's notice of appeal, is null and void because the court did not have jurisdiction of the case at the time of its entry. The Petitioner, in his reply brief, argues that neither he nor the State has raised the agreed order as a bar to this appeal and that the agreed order does not waive his appellate rights. He also asks that this court "refrain from issuing an advisory opinion on the matter" in light of <u>State ex rel. Lewis v. State</u>, 347 S.W.2d at 48. Initially, we acknowledge that the validity of the agreed order does not involve "'a genuine and existing controversy, calling for present adjudication as involving present rights[.]'" <u>Id.</u> (quoting <u>Southern Pac. Co. v. Eshelman</u>, 227 F. 928, 932 (N.D. Cal. 1914) (No. 29)). Consequently, we cannot give an advisory opinion regarding whether this agreed order is void. <u>See</u> <u>Rodgers</u>, 235 S.W.3d at 97; <u>State ex rel. Lewis</u>, 347 S.W.2d at 48. Moreover, this issue is moot because we have affirmed the trial court's grant of a new trial in count 2 and have reversed the trial court and granted a new trial to the Petitioner in counts 1, 4, 5, and 6.

## CONCLUSION

Upon review, the trial court's judgment granting a new trial on count 2 is affirmed, the judgment denying a new trial on counts 1, 4, 5, and 6 is reversed, and the case is remanded to the trial court for entry of an order also granting the Petitioner a new trial on counts 1, 4, 5, and 6.

_____
CAMILLE R. McMULLEN, JUDGE